# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

RAYMOND B. BALDWIN,

        Plaintiff,

v.

                                      Case No.  5:15-cv-594-Oc-34PRL

ROBERT WILKIE, Secretary of
Veterans Affairs, United States Department
of Veterans Affairs,

        Defendant.[1]

_____

## O R D E R

**THIS CAUSE** is before the Court on the Plaintiff [sic] Request Motion for Summary Judgment (Doc. 63, Baldwin Motion), filed on January 5, 2018, and the Federal Defendant's Motion for Summary Judgment (Doc. 69, VA Motion), filed on January 16, 2018 (collectively Motions).  This action arises out of the Department of Veterans Affairs' (VA) decision to transfer Raymond B. Baldwin from his police officer position to a non-law enforcement position, following the VA's determination that Baldwin was unfit to serve as a police officer.  Proceeding pro se, Baldwin generally asserts that the VA's decisions to require him to undergo a fit for duty evaluation (FFDE), and to transfer him from his police officer position, were discriminatory and retaliatory, and subjected him to a hostile work environment, all in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 794.  See generally Second Amended Complaint (Doc. 31, SA Complaint), filed August 25, 2016.

---

[1] Robert Wilkie, the current United States Secretary of Veterans Affairs, is substituted as the proper party defendant pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.  The Clerk will be directed to make the appropriate entries on the docket to reflect the substitution.

In the Baldwin Motion, Baldwin seeks entry of an order granting summary judgment in his favor on his claims that the VA discriminated and retaliated against him by subjecting him to a FFDE which resulted in his removal as a VA police officer, and also subjected him to a hostile work environment.  <u>See</u> Baldwin Motion.  The VA opposes the Baldwin Motion.  <u>See</u> Defendant's Response to Plaintiff's Second Motion for Summary Judgment (Doc. 72, VA Response), filed January 31, 2018.  Additionally, the VA seeks summary judgment in its favor on all of Baldwin's claims.  <u>See</u> VA Motion.[2]  Baldwin opposes the VA Motion.  <u>See</u> Plaintiff's Opposition to the Defendant's Summary Judgment Motion (Doc. 74, Baldwin Response), filed February 16, 2018.  With leave of Court, the VA replied to the Baldwin Response.  <u>See</u> Federal Defendant's Reply in Support of Motion for Summary Judgement (Doc. 78, VA Reply), filed March 23, 2018.[3]  As such, both the Baldwin Motion and the VA Motion are ripe for review.[4]

---

[2] Both parties have submitted numerous exhibits in support of their Motions.  <u>See</u> Doc. 63, Attach. 1-14; Doc. 64; Doc. 65; Doc. 66, Attach. 1-9; Doc. 67, Attach. 1-6; Doc. 69, Attach. 1-10; Doc. 72, Attach. 1-6; Doc. 74, Attach. 1-3.  The Court will initially refer to these exhibits by their docket denomination, rather than by any specific identifiers assigned by the parties.  The Court will also provide narrative titles for the different documents, e.g., "Doc. 63-1 (Marion County Sheriff's Incident Report)," after which the Court will refer to the document by that title, rather than by the court docket number.  Finally, some attachments contain more than one exhibit.  The Court will initially note the page numbers within the attachment which correspond to the document, and thereafter will refer to the document by the narrative title assigned by the Court.

[3] Baldwin sought leave of the Court to file a sur-reply to the VA's Reply.  <u>See</u> Plaintiff's Request for Relief to Reply to Defendant's 3-23-18 Submission (Doc. 79), filed March 30, 2018.  Finding that a sur-reply would not be of assistance, the Court denies this request.

[4] Also pending before the Court is Plaintiff's Request to Add an Additional Claim of Reprisal of Prior EEO Activity (Doc. 87, Motion to Amend), filed on October 24, 2018.  Defendant has filed a response opposing the Motion to Amend.  <u>See</u> Defendant's Response to Plaintiff's Request to Add an Additional Claim of Reprisal (Doc. 90, Response to Motion to Amend), filed on November 7, 2018.  Upon review, the Court readily concludes that the Motion to Amend is due to be denied for at least two reasons.  First, Baldwin filed the Motion to Amend more than a year and a half after the deadline for amendment of pleadings, ten months after the close of discovery, and seven months after all briefing on the dispositive Motions had been completed.  As such, it is monumentally untimely.  Not only has Baldwin failed to show good cause for seeking to modify the Court's deadlines as required by Rule 16, Federal Rules of Civil Procedure, <u>see</u> <u>Sosa v. Airprint Systems, Inc.</u>, 133 F.3d 1417, 1418 (11th Cir. 1998), the record amply shows that Baldwin unduly delayed in seeking to amend, <u>see</u> <u>Foman v. Davis</u>, 371 U.S. 178, 182; <u>see also</u> <u>Hinson v. Clinch County Ga. Bd. of Educ.</u>, 231 F.3d 821, 826 (11th Cir. 2000); <u>Campbell v. Emory Clinic</u>, 166 F.3d 1157, 1162 (11th Cir. 1999) (both affirming findings of undue delay where leave to amend was sought after the close of discovery and the filing of dispositive motions).  Second, the Court notes that the claims sought to be added,

## I.    Standard of Review

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a).  The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Rule 56(c)(1)(A).[5]  An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant.  See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)).  "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment."  Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

---

which arise from events beginning at the earliest in December 2015, after this case was filed, are not sufficiently related to the claims in this action.  Moreover, the Court notes that because the claims are separate and distinct from the claims litigated here, the VA would be unduly prejudiced by the amendment as it would undoubtedly require the reopening of discovery and renewed dispositive motion briefing in this case that has been pending for more than three years.  For all of these reasons, the Motion to Amend will be denied.  If Baldwin wishes to pursue these claims, he must do so in a separate action.

[5] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions."  Rule 56 Advisory Committee's Note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id.  "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive."  Campbell v. Shinseki, 546 Fed. Appx. 874, 879 n.3 (11th Cir. 2013).  Thus, case law construing the former Rule 56 standard of review remains viable and applies here.

In citing to Campbell, the Court notes that "[a]lthough an unpublished opinion is not binding . . . , it is persuasive authority."  United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000) (per curiam); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)). Notably, the instant action is before the Court on cross-motions seeking summary judgment. "The principles governing summary judgment do not change when the parties file cross-motions for summary judgment." T–Mobile S. LLC v. City of Jacksonville, Fla., 564 F.Supp.2d 1337, 1340 (M.D. Fla. 2008). Instead, applying the same principles, "the Court must determine whether either of the parties deserves judgment as a matter of law on the undisputed facts." Id.

The Court further notes that "pro se pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed." Tannenbaum v. United States, 148 F.3d 1262, 1263 (11th Cir. 1998). However, "a pro

se litigant does not escape the essential burden under summary judgment standards of establishing that there is a genuine issue as to a fact material to his case in order to avert summary judgment." <u>Brown v. Crawford</u>, 906 F.2d 667, 670 (11th Cir. 1990). Although courts show leniency to <u>pro se</u> litigants, courts "will not serve as de facto counsel or 'rewrite an otherwise deficient pleading in order to sustain an action.'" <u>Nalls v. Coleman Low Fed. Inst.</u>, 307 Fed. Appx. 296, 298 (11th Cir. 2009) (quoting <u>GJR Invs., Inc. v. County of Escambia</u>, 132 F.3d 1359, 1369 (11th Cir. 1998)).

## II.     Background[6]

The broad facts of this controversy can be summarized as follows: In August of 2008, Baldwin, a police officer for the North Florida/South Georgia Veterans Health System (NF/SGVHS) in Gainesville, FL, accidentally shot his left hand with a personal weapon while off duty. During his recovery, Baldwin was reassigned to light duty work, but also had surgery on his injured finger, requiring him to be out of work for an extended period. When Baldwin sought to return to his full duties as a VA police officer, the VA informed Baldwin that he needed to undergo a FFDE. The final report from his FFDE deemed Baldwin psychologically unfit for police duty. Accordingly, the VA removed Baldwin from his police officer position, but transferred him to the Acquisition and Materials Management Systems (AMMS) department at the same grade and pay level as his police officer position. Baldwin remained employed with the VA in that capacity as of the filings of the Motions. Believing that the reasons for the FFDE were specious and his

---

[6] Because this case is before the Court on cross-motions for summary judgment, the Court will, when addressing the merits of either party's motion, view the facts presented in the light most favorable to the party opposing summary judgment. The Court will so note its perspective when appropriate. The facts recited in this section are either undisputed, or any disagreement has been indicated. <u>See</u> <u>T–Mobile S. LLC</u>, 564 F.Supp.2d at 1340.

job transfer unwarranted, Baldwin filed several Equal Employment Opportunity (EEO) complaints along with a Merit Systems Protection Board (MSPB) action challenging the VA's actions against him. After proceeding through the full administrative process for his EEO and MSPB actions, but failing to prevail in either forum, Baldwin filed the current action in federal court.

More specifically, on August 25, 2008, Baldwin visited his father to collect a gun that his father lawfully possessed. Doc. 69-2 at 5-7 (Baldwin Deposition); Doc. 63-1 at 7 (Marion County Sheriff's Incident Report). When Baldwin received the gun from his father, it was unloaded. Baldwin Deposition at 7. However, as he was driving out of his father's driveway, Baldwin reloaded the weapon and was holding it in his right hand. Id. at 7-9, 12. Baldwin then accidentally "ran off the road and hit a rough spot and [his vehicle] bounced and the gun flew out of [his] hand." Id. at 12; Marion County Sheriff's Incident Report at 7. Baldwin reached for the gun and in doing so, accidentally discharged it. The bullet from the gun grazed his left pinky finger, injuring his left hand. Baldwin Deposition at 13, 21. Baldwin immediately sought emergency care, id. at 18, which included an initial surgery to clean the wound. Doc. 69-9 at 2 (Feb. 12, 2015 EEOC Decision); Baldwin Deposition at 25-26. Baldwin was out of work for several weeks. Doc. 64 at 4 (MSPB Pre-hearing Submission). Because the incident occurred in Marion County and not on VA property, the Marion County Sheriff's Office investigated the event, and determined that "considering all the evidence . . . it appears this [was] an accidental discharge. Nothing [in the case led the investigating officer] to believe that foul play [was] involved." Marion County Sheriff's Incident Report at 7.

On October 20, 2008, Baldwin returned to work. MSPB Pre-hearing Submission at 4. However, because his finger was still healing he "performed light duty tasks as an evening dispatcher." Id. At that time, Chief of Police James Henry Foster did not tell Baldwin that he might need to complete a FFDE before returning to full duty, nor did Foster contemplate the necessity, or lack thereof, of having Baldwin complete a FFDE. Doc. 74-1 at 44-45 (August 8, 2011 MSPB Hearing).

Soon thereafter, Baldwin learned he would need to have corrective surgery on his finger, requiring him to take additional leave from work. Doc. 69-8 at 10 (Baldwin EEO Complaints); MSPB Pre-hearing Submission at 4. He had the surgery on December 16, 2008. Baldwin EEO Complaints at 10; MSPB Pre-hearing Submission at 4; Doc. 69-3 at 22 (Baldwin's Answers to Interrogatories). On January 5, 2009, Baldwin's doctor cleared him to return to work on "light duty" for four weeks, and according to Baldwin, by February 4, 2009, his finger was fully functional with no limitations. Baldwin Deposition at 22; Baldwin's Answers to Interrogatories at 22; MSPB Pre-hearing Submission at 4.

During Baldwin's leave from work after his second finger surgery, Foster left the NF/SGVHS to work elsewhere, and was replaced by then second-in-command Milton Gordon. Doc. 69-5 at 4-5 (Gordon EEO Investigation Testimony); August 8, 2011 MSPB Hearing at 51; MSPB Pre-hearing Submission at 50. Gordon was generally familiar with Baldwin and the circumstances of his shooting accident. Gordon EEO Investigation Testimony at 5. On or around January 5, 2009, Gordon informed Baldwin that even though Baldwin's personal physician had cleared him to return to "light duty" work on January 5, 2009, see Baldwin EEO Complaints at 11; Baldwin's Answers to Interrogatories at 23, Baldwin could not resume his full police duties unless and until he

received clearance from the Employee Health Physician, Dr. John C. Charnas, which would require both a physical and psychological FFDE. See Baldwin EEO Complaints at 11; Gordon EEO Investigation Testimony at 6, 16; Doc. 74-2 at 54-55 (August 12, 2011 MSPB Hearing).

Pursuant to VA employment regulations, VA police officers must maintain specific physical and psychological standards at all times in order to hold an officer position and carry a firearm. Doc. 69-3 at 2 (January 28, 2009 FFDE Notification); Doc. 69-6 at 2 (April 27, 2009 Proposed Notice of Removal); Doc. 69-4 at 2 (April 7, 2010 Correspondence to Baldwin); Doc. 64 at 94 (VA Handbook 0720); Doc. 64 at 116 (VA Handbook 0730); Doc. 65-1 at 20-21 (VA Handbook 0730 Appendix A); Doc. 69-1 at ¶ 3 (Sutton Declaration). Accordingly, VA police officers are required to undergo a yearly FFDE. Gordon EEO Investigation Testimony at 6; Baldwin Deposition at 16-18. The record further reflects that if an employee has been out of work for an extended period of time for health reasons, or the employee has engaged in activities that cause supervisors to question the employee's fitness for duty, the employee may be required to submit to an additional examination of his or her fitness to serve. Gordon EEO Investigation Testimony at 6; MSPB Pre-hearing Submission at 5; August 8, 2011 MSPB Hearing at 27, 46; Doc. 66-7 at 19 (Danny McCamley Deposition).

In considering Baldwin's return to work, Gordon explained he was concerned that Baldwin was psychologically unfit for police duty after having exercised poor judgment in loading and handling a firearm while driving a vehicle. August 12, 2011 MSPB Hearing at 84. Gordon noted that

> [Baldwin] is very knowledgeable about firearms and [the accidental discharge] certainly contributed to a high degree of negligence and reckless

> endangerment. . . . Had that discharged weapon exited [Baldwin's] vehicle it could have easily entered another passing vehicle, a passing pedestrian or some other such incident. I was very, very concerned about [Baldwin's] judgment. [H]ere is a person operating a motor vehicle and handling a loaded firearm at the same time, which showed extremely, extremely poor judgment . . . . There's certainly nothing wrong with him having a loaded firearm in his vehicle, but to be handling it or to be manipulating it or whatever he was doing with it was certainly judgmentally poor.

Id. at 84-86. Gordon also stated that a secondary and lesser reason he questioned Baldwin's fitness for duty was related to allegedly "bizarre statements" Baldwin made in the general presence of Gordon and other VA police officers regarding Baldwin molesting his daughter, giving her herpes, and stating she was not good at oral sex. Gordon EEO Investigation Testimony at 6-7, 11, 19; MSPB Pre-hearing Submission at 6; August 12, 2011 MSPB Hearing at 54-55, 56-58, 109. From this, Gordon believed "there were things going on in [Baldwin's] life that could hamper or interfere with [his] decision making process as a police officer." August 12, 2011 MSPB Hearing at 56.

Because of his concerns, and after consulting with VA Human Resources to ensure that he appropriately followed the relevant personnel procedures, Gordon initiated Baldwin's FFDE process. See January 28, 2009 FFDE Notification at 2-3; Gordon EEO Investigation Testimony at 11, 17, 19; MSPB Pre-hearing Submission at 6. In particular, NF/SGVHS Human Resources Department provided Baldwin a letter dated January 28, 2009, stating that

> [b]ased on concerns regarding your recent accident involving a firearm and the circumstances surrounding that accident while in an [off] duty status, your ability to perform the full range of your duties without impairing your own health or the health of others is questionable. Therefore, a psychological examination has been scheduled to determine if you meet the full requirements of your assigned position.

January 28, 2009 FFDE Notification at 2-3.  Because Baldwin had already used all of his leave time to recover from his accidental shooting incident, Gordon temporarily assigned Baldwin to work in AMMS.  Gordon EEO Investigation Testimony at 8; August 12, 2011 MSPB Hearing at 208-09.

After completing his physical FFDE with Charnas, Baldwin completed a psychological evaluation with Dr. Paul R. Bessette.  The evaluation included a variety of personality assessment tests and several interviews with Bessette between February 4, 2009, and March 11, 2009.  Doc. 69-3 at 4 (March 16, 2009 Charnas FFDE Letter). Discussing the results of Baldwin's personality testing, Bessette reported that Baldwin presented a "defensive test taking posture and [an] effort to 'fake good' . . . and an attempt to portray himself favorably."  Doc. 69-3 at 8 (Bessette FFDE Report).  On other tests, Baldwin's "[d]efensiveness [was] so profound that little [could] be learned from looking at the clinical scores."  Id.  On one test, Baldwin "was not entirely candid about his feelings and behaviors. . . .  He denies minimal shortcomings which most people readily admit to having.  Limited insight and strong concern for appearances are indicated."  Id.  Likewise, Bessette opined that Baldwin "was not totally open when answering the [test] survey questions.  It seems he was trying to project an inflated image of himself."  Id.  Bessette commented that "[w]hile [Baldwin's] impulsivity is not extreme, the extent to which these tendencies exist are a concern."  Id.  Bessette determined that according to the personality testing, Baldwin "is a moderate risk for integrity problems or job related problems. . . .  His . . . scores . . . suggest a possible history of behavior that is viewed as

abrasive, intrusive, challenging, demeaning, or confrontational." <u>Id</u>. at 8-9.[7]  In concluding

his report, Bessette stated:

> I am surprised that [the VA] police service hired this individual in the first place, considering that they were privy to his legal record. . . . There is . . . indication of impulsivity.  Additionally, he appears to have withheld significant information during the structured interview.
>
> He demonstrates a long history of interpersonal conflict and difficulty managing anger.  There is a long legal history, and he appears to time-and-again just barely avoid adjudication that would clearly disqualify him from working in law enforcement.  Nevertheless, the extent of his legal entanglements (i.e., disregard for the law or poor judgment or acting impulsively) suggests that he is not well suited for work in law enforcement. . . .  His history of interpersonal conflict and poor anger control suggest that he does not possess the level of emotional stability required.  I have serious reservations about this individual being authorized to carry a firearm in the line of duty.  Perhaps he would be better suited for employment in another department within the VA.

---

[7] In the report, Bessette included a list of Baldwin's various incidents of workplace discipline as well as arrests and other legal entanglements.  Along with several car repossessions, multiple traffic violations, and two instances of being charged with workplace harassment (harassment of a patient and sexual harassment of a student intern), Bessette's report included information regarding Baldwin's arrest record, as well as his sometimes strained relationship with his wife and in-laws.  <u>See</u> Bessette FFDE Report at 5-6; <u>see also</u> Baldwin Deposition at 43-49.  For example, in "1986, . . . Baldwin and his wife went to marriage counseling after what he described as 'domestic violence.'  He related 'pushing' her and she 'scratching' him.  A sheriff's deputy responded, but neither of them was arrested or charged." Bessette FFDE Report at 5.  Likewise,  Bessette's report listed six additional instances in which Baldwin was arrested and/or charged by police: a February 1985 charge for resisting an officer without violence and refusal to sign a citation (held disposition); an April 1985 charge for damage to property (dismissed); a 1987 arrest for sexually molesting his daughter as accused by his mother-in-law (no charge); a 1987 arrest and conviction for disorderly conduct which was subsequently "expunged" by a Governor's pardon; a July 2003 charge of battery misdemeanor in the first degree (held disposition); and an October 2003 charge of domestic battery with violence (nolle prose).  <u>Id</u>. at 5-6.

There is some question about how Bessette learned of Baldwin's arrest history, and it appears that Bessette's catalogue of Baldwin's arrest and charge history contained inaccuracies regarding the dates of the incidents and the specific charges against Baldwin.  <u>See e.g.</u>, Baldwin EEO Complaints at 4.  For example, Baldwin's criminal history report indicates that the February 1985 charge detailed in Bessette's report is more accurately described as "refuse[d] to accept sign citation or post bond," and was dismissed.  Doc. 74-3 at 76-77 (Baldwin Criminal Record Report).  Likewise, in July of 2003, Baldwin was charged with a first degree misdemeanor of battery.  <u>Id</u>. at 77.  On October 13, 2003, the charge was nolle prossed.  No new charge was filed against Baldwin on October 13, 2003.  <u>Id</u>.  Hence, it appears that Bessette erroneously separated the proceedings associated with the July 2003 incident, describing it as two separate charges rather than one.

Regardless of the inaccuracies in Bessette's report, Baldwin confirmed the underlying substance of his criminal history in his own deposition.  <u>See</u> Baldwin Deposition at 77-79 (affirming February 1985 charge of refusing to sign a citation); <u>id</u>. (affirming April 1985 charges of damage to property); <u>id</u>. at 37-38 (affirming 1987 questioning for molesting daughter, but challenging that he was arrested); <u>id</u>. at 37 (affirming 1987 arrest and conviction for disorderly conduct); <u>id</u>. at 40, 80-81 (affirming July 2003 charge of battery misdemeanor in the first degree, but clarifying that there was no additional charge on October 13, 2003).

Id. at 9-10.

Upon receiving Bessette's report, Charnas, as the Employee Health Physician, recommended to his supervisors on March 16, 2009, that Baldwin "be considered unfit for duty as a police officer. He should not be authorized to carry a firearm in the line of duty." March 16, 2009 Charnas FFDE Letter at 4. On April 27, 2009, Gordon sent a letter to Baldwin advising Baldwin of NF/SGVHS's proposal to remove him from his position as a police officer. April 27, 2009 Proposed Notice of Removal at 2. The letter stated that Baldwin had

> failed to maintain the position requirements of a police officer following an unfit for duty finding after a Fitness for Duty evaluation. This evaluation is based upon a psychological evaluation which recommended that you be considered unfit for duty as a police officer and should not be authorized to carry a firearm in the line of duty. Employment as a police officer requires the capability of performing the designated physical and mental functional requirements essential to the duties of the police officer position. Therefore, you are no longer capable of maintaining your position requirements as a police officer.

Id.; see also Gordon EEO Investigation Testimony at 10-11, 12, 14, 16.[8]

This information was eventually transmitted to Thomas Sutton, Associate Medical Center Director of the NF/SGVHS. Sutton Declaration at ¶ 1. After reviewing all the pertinent information regarding Baldwin's FFDE and proposed removal, Sutton sustained the proposal to remove Baldwin as a VA Police Officer but recommended that Baldwin be considered for reassignment to another position at the same grade outside of the Police Service. Doc. 69-3 at 14 (Baldwin White Paper Case Summary). In a letter dated March 10, 2010, Sutton advised Baldwin of his acceptance of the April 2009 proposed removal but noted that "a decision has been made to reassign you to another position, of the same

---

[8] Baldwin acknowledged receipt of this letter on April 30, 2009. See April 27, 2009 Proposed Notice of Removal at 3.

grade and pay, within Acquisition and Material Management Service . . . .  This assignment will begin on March 15, 2010."  Doc. 69-7 at 2 (March 10, 2010 Proposed Removal Decision Letter); MSPB Pre-hearing Submission at 9; Sutton Declaration at ¶ 6.[9]

In late December, 2009, and after receiving Gordon's April 27, 2009 Proposed Removal Decision, Baldwin filed an EEO complaint challenging the basis for the FFDE and the proposed removal.  In his EEO complaint, Baldwin included a variety of claims, including discrimination, reprisal, retaliation, and harassment.  See generally Baldwin EEO Complaints.  On January 12, 2012, the VA Office of Employment Discrimination issued a final agency decision rejecting Baldwin's claims, Doc. 63-11 at 2–24 (January 12, 2012 VA EEO Final Agency Decision), and the Equal Opportunity Commission upheld the decision on February 12, 2015.  See Feb. 12, 2015 EEOC Decision.[10]

During this same time period, Baldwin also initiated a separate MSPB proceeding asserting that the requirement that he submit to the FFDE was retaliatory.  See generally MSPB Pre-hearing Submission.  Specifically, Baldwin alleged that Gordon ordered the FFDE in retaliation for Baldwin's participation in a whistleblowing investigation regarding another officer's alleged unauthorized use of a government vehicle which tangentially implicated Gordon.  MSPB Pre-hearing Submission at 9-10; Baldwin Deposition at 67-71; Baldwin EEO Complaints at 17.  On August 26, 2011, an administrative judge denied

---

[9] Baldwin acknowledged receipt of this letter on March 11, 2010.  See March 10, 2010 Proposed Removal Decision Letter at 3.

[10] While the record is not entirely clear, it appears Baldwin initially informed the VA EEO of his concerns regarding the FFDE in September 2009, and then later initiated a number of separate formal EEO actions. See e.g., Baldwin Deposition at 85-86, 95-100; Baldwin EEO Complaints.  Nonetheless, the record reflects that by the time he filed his current federal action, all of his EEO complaints had fully proceeded through the administrative process.  Baldwin Deposition at 75, 95-99.

Baldwin's claim.  See Doc. 74-3 at 111–126 (August 26, 2011, MSPB Decision).  That decision was upheld in a final order dated April 12, 2012.  Baldwin Deposition at 97.

In the course of Baldwin's various attempts to challenge his removal from police duty, he encountered VA EEO legal staff who made derogatory statements about him and his efforts.  For example, in his answers to the VA's interrogatories, Baldwin states that in June of 2011, an individual present during a union mediation meeting told Baldwin that "as far as the agency is concerned, you are never getting your law enforcement position back."  Baldwin's Answers to Interrogatories at 27.  Similarly, Baldwin recalls that on September 25, 2013, an EEO staff attorney told Baldwin, "[y]ou are never getting your position back."  Id.  Finally, Baldwin states that on January 7, 2016, a different EEO staff attorney stated that "Mr. Baldwin can go elsewhere to get his law enforce[ment] position.  Mr. Baldwin is an undesirable and unsuited for the position with the VA."  Id.[11]

As a result of the discovery process associated with his EEO claims, Baldwin also came to believe that he had been placed on a "Last Chance Agreement" ("LCA") without his knowledge.  SA Complaint at ¶ 42; Baldwin Deposition at 88-93; Doc. 67-5 at 2-4. (LCA Documentation).[12]  However, Baldwin never received a copy of the LCA, never signed such an agreement, nor could he confirm that the LCA actually existed.  Baldwin Deposition at 90, 92-93.  Nonetheless, Baldwin viewed the potential existence of an LCA as unlawfully rendered under false pretenses, and detailed as much in an e-mail dated

---

[11] Aside from Baldwin's answers to the VA's interrogatories, nothing in the record corroborates the alleged derogatory statements made to him by EEO legal staff.  Nevertheless, for the purposes of resolving the VA Motion, the Court assumes the statements were made as Baldwin describes.

[12] Baldwin describes an LCA as

> another process of disciplinary action on an employee. . . .  A last-chance agreement is that you did something wrong; we should have fired you for it; but we're giving you a second chance as an employee. You're put[] on a probation period.  During that time, if you do anything wrong we have the right to automatically dismiss you.

Baldwin Deposition at 89-90.

September 16, 2013, to then Secretary of the VA, Eric Shinseki. LCA Documentation at 6. In response, in a letter dated September 19, 2013, Thomas Wisnieski, Director of the NF/SGVHS, sought to correct Baldwin's belief, informing him that

> [a]ll past and present referencing by management officials, regarding you and a LCA was a misunderstanding . . . . We acknowledge that you are not and have not been on a LCA. . . . Your Service has been advised that you were never on a LCA, and to cease any references of such in regard to you.

LCA Documentation at 7.

Based on these facts, in his SA Complaint, Baldwin asserts eight claims against the VA seeking "back pay, front pay, injunctive and other relief from [the VA] for violations of the Rehabilitation Act of 1973, and the anti-retaliation provisions of that Act." SA Complaint at ¶ 1. His claims against the VA can be grouped into three categories: discrimination claims (Counts I, III, and VII), retaliation claims (Counts II, IV and VIII), and harassment/hostile work environment claims (Counts V and VI).

In Count I (disability discrimination), Baldwin asserts that the VA "has unlawfully discriminated against [him] based on his disability and/or perceived disability" by forcing him to "undergo a psychological examination with the psychologist being provided bogus information about [Baldwin and] his being removed from his position as a police officer." Id. at ¶¶ 47-48. In Count III (EEO Discrimination – Direct Threat), Baldwin asserts that the VA discriminated against him "based on his disability and/or perceived disability in violation of [his] rights under EEO laws, per 29 C.F.R. 1630.2(r), Direct Threat, by performing a FFDE on [him] without just cause." Id. at ¶ 55. As a result of this decision, Baldwin claims he was unlawfully removed "from his position as a police officer" and reassigned to AMMS. Id. at ¶ 56. Finally, in Count VII (failure to accommodate), Baldwin alleges that the VA "unlawfully discriminated against [him] based on his disability and/or

perceived disability in violation of EEO protected rights, in which the [VA] denied [Baldwin] reasonable accommodations upon [his] release to return to work by his attending physician." Id. at ¶ 71.

Baldwin alleges his retaliation claims in Counts II, IV and VIII. In Count II (retaliation), Baldwin asserts that after he "submitted an internal complaint of discrimination and subsequently a complaint externally, he was subjected to retaliation which included being forced to undergo a psychological examination with the psychologist being provided bogus information about [Baldwin and] being removed from his position as a police officer." Id. at ¶ 51. Baldwin's allegations in Count IV mirror his claims in Count II. Therefore, the Court will treat these counts as one and the same. In Count VIII (non-selection), Baldwin claims the VA retaliated against him for his prior EEO activity by not selecting him for a newly posted police officer position within the VA. Id. at ¶ 75.

Finally, Baldwin's harassment/hostile work environment claims are set forth in Counts V and VI. In Count V (harassment LCA), Baldwin reasserts some of the same grievances laid out in Count II, but adds that he "was subjected to an extreme Hostile Work Environment [wherein Baldwin] was under a Last Chance Agreement, in which [he] was under the fear of being fired." Id. at ¶ 63. Baldwin's Count VI (hostile work environment) closely mirrors his initial allegations in Count V, but he adds that he "was subjected to [an] extreme Hostile Work Environment on 3 occasions, in which [VA] staff advised [Baldwin] and/or EEOC [Administrative Law Judges] that [he] will never get his law enforcement position back, and that [Baldwin] is an undesirable." Id. at ¶ 67.

### III.    Arguments of the Parties

Both Baldwin and the VA have filed motions seeking summary judgment.  In the Baldwin Motion, Baldwin provides little in terms of legal argument or reliance on applicable authority.[13]  Instead, he devotes the majority of his filing to laying out a factual argument challenging the basis for the outcome of the FFDE, arguing that the FFDE lacked just cause, was issued for evolving and specious reasons, was based on erroneous information, had a predetermined outcome, and resulted in his unfair removal from the position of a police officer.  He also catalogues a host of perceived procedural errors and unfairness he suffered in the course of being subjected to the FFDE, as well as in his process of submitting and having his EEO actions reviewed.  See generally Baldwin Motion.  In response, the VA broadly argues that Baldwin has failed to satisfy the legal standard for a motion for summary judgment because Baldwin has not presented any evidence that he was reassigned because of a disability, or that he was subjected to retaliation.  VA Response at 6.

In the VA Motion, the VA lays out three core arguments.  First, as to Baldwin's discrimination claims, the VA asserts that Baldwin cannot prevail on his discrimination

---

[13] The Court notes that in the Baldwin Motion, Baldwin only presents arguments for summary judgment on Counts I – V, and does not address Counts VI – VIII.  See generally Baldwin Motion.  The VA seeks summary judgment on all of Baldwin's claims.  See generally VA Motion.  Baldwin filed his response to the VA's Motion, in which he had every opportunity to defend all his claims.  See generally Baldwin Response. Additionally, the Court issued a Summary Judgment Notice (Doc. 68, filed January 10, 2018), which specifically informed Baldwin that

> (1) failing to respond to [defendant's] motion(s) will indicate that the motion(s) are not opposed; (2) all material facts asserted by the [defendant] in the motion(s) will be considered to be admitted by you unless controverted by proper evidentiary materials (counter-affidavits, depositions, exhibits, etc.) filed by you; and (3) you may not rely solely on the allegations of the issue pleadings (e.g., complaint, answer, etc.) in opposing these motion(s).

Summary Judgment Notice at 2.  As such, Baldwin does not lack notice of the VA's arguments, nor was he denied an opportunity to address the claims for which he did not seek summary judgment.

claims in Counts I, III, and VII because "[t]he undisputed facts show that [Baldwin] was not unlawfully discriminated against under the Rehabilitation Act because he was not a qualified individual with a disability." VA Motion at 2. Second, in addressing Baldwin's retaliation claims, the VA argues that Baldwin has failed to make out a prima facie case for retaliation, therefore requiring dismissal of Counts II, IV, and VIII. Id. [14] Finally, the VA contends that Baldwin cannot make a prima facie case for his harassment claims, and consequently Counts V and VI must fail. Id.

In response, and in similar fashion to his motion for summary judgment, Baldwin provides little to no legal argument regarding the substance of his claims, but rather focuses on highlighting facts he believes support his position that he was subjected to a baseless FFDE, as well as his concerns that certain aspects of his criminal history were falsely or erroneously reported in Bessette's FFDE report. Baldwin Response at 1–12. In the Baldwin Response, Baldwin also asserts for the first time in this litigation that the VA subjected him to the FFDE in retaliation for his whistleblowing activity regarding another officer's alleged unauthorized use of a government vehicle. Id. at 12-13. In the VA's Reply, the VA notes that regardless of Baldwin's voluminous recitation of facts, he failed to identify how those facts are disputed, much less rise to the level of being material. VA Reply at 2-3. The VA reiterates the positions it laid out in the VA Motion, noting that the VA did not order Baldwin's FFDE for discriminatory or retaliatory reasons. Id. at 3-6. The VA also asserts that to the extent Baldwin believes his criminal history was erroneously recorded in the psychologist's FFDE summary, Baldwin himself "confirmed

---

[14] Although the VA repeatedly argues in terms of dismissal, this case is before the Court on motions for summary judgment. Thus, the Court construes the requests for dismissal as requests for entry of summary judgment.

the findings in Bessette's report" in his deposition.  Id. at 8-10.  In conclusion, the VA reasserts that Baldwin failed to make out a prima facie case for any of his claims, and therefore all the claims in the SA Complaint should be dismissed.

For the reasons discussed below, after a thorough review of the record and the parties' memoranda, the Court determines that the VA Motion is due to be granted in its entirety and that summary judgment is due to be entered in favor of the VA.  As such, the Court will not separately address the Baldwin Motion.  This is so because the Court's determinations that each of Baldwin's claims fail as a matter of law necessarily dictate that his motion for entry of summary judgment in his favor as to any of his claims fails.

## IV.    Discussion

### a.  Discrimination Claims (Counts I, III and VII)

In Counts I, III and VII Baldwin generally asserts that the VA discriminated against him based on his disability or perceived disability by forcing him to complete a FFDE and subsequently removing him from his police officer position.  Specifically, in Count I, Baldwin asserts the VA discriminated against him when it forced him to "undergo a psychological examination with the psychologist being provided bogus information about [Baldwin and] his being removed from his position as a police officer."  SA Complaint at ¶¶ 47-48.  In Count III, Baldwin contends he was required to undergo the psychological FFDE "without just cause."  Id. at ¶ 55.  Finally, in Count VII, Baldwin alleges he was denied "reasonable accommodations upon [his] release to return to work by his attending physician."  Id. at ¶ 71.  He raises all these disability discrimination claims pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 794.

The Rehabilitation Act "prohibits entities receiving federal funds from discriminating against otherwise qualified individuals with disabilities."  Boyle v. City of Pell City, 866 F.3d 1280, 1288 (11th Cir. 2017) (citing Garrett v. Univ. of Ala. at Birmingham Bd. of Trs., 507 F.3d 1306, 1310 (11th Cir. 2007)).  The Rehabilitation Act shares the same standards for determining liability as the Americans with Disabilities Act (ADA), 42 U.S.C. § 1201.  Id; Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005).  Therefore, "cases involving the ADA are precedent for those involving the Rehabilitation Act."  Boyle, 866 F.3d at 1288; Ellis, 432 F.3d at 1326.  A plaintiff seeking relief under the Rehabilitation Act may

> prove disability discrimination through either direct evidence of discrimination, or through circumstantial evidence.  If the plaintiff relies on circumstantial evidence, the McDonnell Douglas [Corp. v. Green, 411 U.S. 792 (1973)] burden-shifting framework applies.  Accordingly, the plaintiff must establish a prima facie case for discrimination, the defendant must offer a legitimate, non-discriminatory justification for the employment decision, and the plaintiff must ultimately prove that the defendant's justification is a pretext for discrimination.

Curry v. Sec'y, Dep't of Veterans Affairs, 518 Fed. Appx. 957, 963–64 (11th Cir. 2013); see also Boone v. Rumsfeld, 172 Fed. Appx. 268, 270–71 (11th Cir. 2006).  "To establish a prima facie case of discrimination under the Rehabilitation Act, a plaintiff must show that (1) he has a disability, (2) he is otherwise qualified for the position, and (3) he was subjected to unlawful discrimination as a result of his disability."  Boyle, 866 F.3d at 1288; Ellis, 432 F.3d at 1326.

The applicable law[15] defines the term "disability" to mean "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B)

---

[15] In the ADA Amendments Act of 2008 (ADAAA), Pub. L. No. 110-325, 112 Stat. 3553, Congress made a variety of changes to the ADA, and by extension, to the Rehabilitation Act, which included broadening the definition of what constitutes a disability.  See United States EEOC v. St. Joseph's Hosp., Inc., 842 F.3d

a record of such an impairment; or (C) being regarded as having such an impairment . . .

.”  42 U.S.C. § 12102(1).  A “major life activity” may include, but is not limited to “caring

for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing,

lifting, bending, speaking, breathing, learning, reading, concentrating, thinking,

communicating, and working.”  Id. at § 12102(2)(A).  An impairment is considered to

substantially limit a major life activity where the individual is

> unable to perform a major life activity that the average person in the general
> population can perform or significantly restricted as to the condition, manner
> or duration under which an individual can perform a particular major life
> activity as compared to the condition, manner, or duration under which the
> average person in the general population can perform the same major life
> activity.  29 C.F.R. § 1630.2(i)(1)(i), (ii).

Malone v. Dep't of the Air Force, No. 2:14cv670-MHT, 2016 WL 1170906, at *7 (M.D. Ala.

Feb. 24, 2016), report and recommendation adopted by No. 2:14CV670-MHT, 2016 WL

1163306 (M.D. Ala. Mar. 24, 2016).[16]  Notably, an individual need not be impaired for a

set period of time in order to establish that he or she is actually disabled.  Sufficiently

severe temporary impairments which substantially limit a major life activity may qualify as

a protected disability.  See Summers, 740 F.3d at 329 (“Although impairments that last

only for a short period of time are typically not covered, they may be covered if sufficiently

severe.” (internal quotations and citation omitted)).  See also Hill v. Branch Banking &

---

1333, 1343 (11th Cir. 2016); Mazzeo v. Color Resolutions Int'l, LLC, 746 F.3d 1264, 1267 (11th Cir. 2014);
Summers v. Altarum Institute, Corp., 740 F. 3d 325, 329 (4th Cir. 2014); Wolfe v. Postmaster Gen., 488
Fed. Appx. 465, 467 (11th Cir. 2012).  The statutory changes became effective on January 1, 2009.  See
Mazzeo, 746 F.3d at 1267.  While Baldwin's injury and recovery period covered the latter part of 2008, the
alleged discriminatory acts of which he complains, namely having to complete a FFDE and being removed
from his police officer post, all occurred after the effective date of the ADAAA.  Therefore, the Court will
apply the terms from the amended statute to Baldwin's disability discrimination claims. See Wolf, 488 Fed.
Appx. at 467.
[16] Eleventh Circuit precedent instructs that in applying the Rehabilitation Act, courts can look to “the
regulations of the Equal Employment Opportunity Commission (‘EEOC’)” for guidance as to the definition
of terms such as “major life activity,” and “substantially limits.”  Garrett, 507 F.3d at 1311.

Trust Co., 264 F. Supp. 3d 1247, 1258 (N.D. Ala. 2017); Cappetta v. N. Fulton Eye Ctr., No. 1:15-CV-3412-LMM-JSA, 2017 WL 5197207, at *22 (N.D. Ga. Feb. 1, 2017); Leone v. Alliance Foods, Inc., No. 8:14-cv-800-T-27TBM, 2015 WL 4879406, at *6 (M.D. Fla. Aug. 14, 2015); Booth v. Houston, 58 F. Supp. 3d 1277, 1293-94 (M.D. Ala. 2014); Vaughan v. World Changers Church Int'l, Inc., No. 1:13-CV-0746-AT, 2014 WL 4978439, at *9 (N.D. Ga. Sept. 16, 2014). Conversely, where an individual asserts that he or she was "regarded as" being disabled, the statute directs that "being regarded as having . . . an impairment . . . shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less." 42 U.S.C. § 12102(3)(A)-(B).

In addressing the second required element of a prima facie case of disability discrimination – that the person with a disability is "otherwise qualified for the position" – courts consider whether the individual is "able to perform the essential functions of the job in question with or without a reasonable accommodation. The issue of whether an employee is an otherwise qualified individual and whether a reasonable accommodation can be made for that employee is determined by reference to a specific position." Boyle, 866 F.3d at 1288 (internal quotations and citations omitted). Importantly, in order to show that an individual was subjected to unlawful discrimination as a result of his disability "[i]t is not enough for a plaintiff to demonstrate that an adverse employment action was based partly on his disability. Rather, under the Rehabilitation Act, a plaintiff must prove that he

suffered an adverse employment action 'solely by reason of' his [disability[17]]. 29 U.S.C. § 794(a)." Ellis, 432 F.3d at 1326 (internal citations omitted).

Turing to the merits of Baldwin's disability discrimination claims, Baldwin must first establish that he has a disability. In this regard, Baldwin asserts that the VA either directly discriminated against him on the basis of a disability, or that the VA "perceived him" as disabled. SA Complaint at ¶ 47. In doing so, Baldwin contends that the "injury/surgery" to his left small finger rendered him disabled between the dates of August 26, 2008, and October 17, 2008, after he initially shot his finger, and then again between December 16, 2008, and February 4, 2009, while he recovered from additional surgery on his finger. See Baldwin's Answer to Interrogatories at 22. During this time, Baldwin claims his injury substantially impacted his major life activities such as "being able to work, reach, [and] lift with his left arm and hand." Id. at 26.

The VA does not argue that Baldwin is not disabled as a matter of law.[18] Rather, it merely questions whether his "impairment was severe enough to constitute a disability,"

---

[17] See Cash v. Smith, 231 F.3d 1301, 1305 n.3 (2000) (recognizing that while the Rehabilitation Act uses the term "handicap" rather than "disability," the terms can be used interchangeably in the context of a discrimination case under either the ADA or the Rehabilitation Act).

[18] Had the VA challenged this element of Baldwin's disability discrimination claims, it likely would have prevailed on the issue. Between August 26, 2008, and October 17, 2008, the first period during which Baldwin alleges he was disabled, the VA gave him a light duty assignment as an evening dispatcher. MSPB Pre-hearing Submission at 4. Between December 16, 2008, and January 5, 2009, as he was recovering from the second surgery on his finger, and prior to being cleared by his personal doctor to fully use his finger, Baldwin took a leave from work. However, any disability Baldwin suffered as a result of his injured finger ceased on February 4, 2009, when, based on his own admissions and his doctor's report, Baldwin's finger was fully functional again. Baldwin Deposition at 23; Baldwin's Answers to Interrogatories at 22; MSPB Pre-hearing Submission at 4; August 12, 2011 MSPB Hearing at 241 (Baldwin testifying that his finger injury was a temporary disability.). On this record, assuming Baldwin's finger injury constituted a disability, it was temporary and not chronic. See e.g., Clark v. Boyd Tunica, Inc., No. 3:14CV00204MPMJMV, 2016 WL 853529, at *4-5 (N.D. Miss. March 1, 2016) (broken foot which took five months to heal and did not create a permanent injury does not constitute a disability); Leone, 2015 WL 4879406, at *7 (short duration of eye injury recovery where vision was not totally impaired did not constitute a disability); Mastrio v. Eurest Servs., Inc., No. 3:13-cv-00564 (VLB), 2014 WL 840229, at *5 (D. Conn. March 4, 2014) (short term impairment from recovery from kidney stone surgery not a disability); McKenzie-Nevolas v. Deaconess Holdings LLC, No. CIV-12-570-D, 2014 WL 518086, at *5 (W.D. Okla. Feb. 7, 2014) (where infection was limited to one part of body and temporary rather than chronic, court determined no

23

VA Motion at 13, and instead focuses its argument on whether, "[a]ssuming arguendo . . . that [Baldwin] was disabled, he was still not a 'qualified individual' because he could not perform the essential functions of the position." Id. at 14. Thus, for the purposes of resolving the VA Motion, the Court also will assume arguendo that Baldwin was actually disabled.

In addition to asserting that he had an actual disability, Baldwin asserts that the VA discriminated against him based on a "perceived disability." SA Complaint at ¶¶ 47, 55, 71. However, Baldwin's perceived disability claim fails as a matter of law. See 41 U.S.C. § 1202(1)(c). The Rehabilitation Act directs that "being regarded as having . . . an impairment . . . shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less." Id. at § 12102(3)(b). See also e.g., Smart v. Dekalb County Ga., No. 1:16-cv-826-WSD, 2018 WL 1089677, at *9 n.8 (N.D. Ga. Feb. 26, 2018); Hammonds v. Dolgencorp, LLC, No. 4:14-cv-0067-HLM-WEJ, 2015 WL 12591769, at *7-8 n.23 (N.D. Ga. Oct. 19, 2015); Lozoyo v. Oldcastle Surfaces, Inc., No. 1:14-CV-1057-LMM-JSA, 2015 WL 12851559, at *11 (N.D. Ga. July 22, 2015) report and recommendation adopted by No. 1:14-CV-1057-LMM-JSA, 2015 WL 12852973 (N.D. Ga. Aug. 17, 2015); Snider v. U.S. Steel-Fairfield Works Med. Dep't, 25 F. Supp. 3d 1361, 1366 (N.D. Ala. 2014). Here, Baldwin shot himself in the finger in late August of 2008, and he was able to resume full work duties in early February of 2009. See Baldwin Deposition at 23; Baldwin's Answers to

---

disability); Bush v. Donahoe, 964 F. Supp. 2d 401, 421 (W.D. Pa. 2013) (plaintiff's ankle/foot sprain properly characterized as temporary non-chronic ailment and thus not a disability). Therefore, based on the undisputed record evidence, Baldwin likely could not establish that he was an individual with an actual disability.

Interrogatories at 22; MSPB Pre-hearing Submission at 4. Hence, he suffered from his impairment for about five and a half months. Likewise, he was out of work for just under twelve weeks, between August 26 and October 17, 2008, and then again between December 16, 2008 and February 9, 2009. Baldwin's Answers to Interrogatories at 22. Accordingly, the brief duration of Baldwin's finger injury precludes him from establishing that he was an "individual with a disability" based on having been perceived as disabled.

Because Baldwin cannot establish he falls within the definition of an "individual with a disability," Boyle, 866 F.3d at 1288, based on a perceived disability, he is unable to make out a prima facie case of disability discrimination on that basis. See id.; Wolfe, 488 Fed. Appx. at 467; Ellis, 432 F.3d at 1326. Nonetheless, the Court has assumed arguendo that Baldwin's finger injury constitutes an actual disability under the law. However, this assumption does not salvage his disability claims because Baldwin fails to present evidence raising a genuine issue of fact as to the other required elements of the claim. Specifically, the record evidence establishes that Baldwin was not otherwise qualified for the police officer position, Boyle, 866 F.3d at 1288, and further fails to support even an inference that the VA discriminated against him solely because of his alleged disability. Ellis, 432 F.3d at 1326.

To show that he was "otherwise qualified for the position," Baldwin was required to present evidence that he was "able to perform the essential functions of the job in question with or without a reasonable accommodation." Boyle, 866 F.3d at 1288. However, the record affirmatively demonstrates that as a result of the FFDE, Baldwin was not qualified to serve as a VA police officer. In this context, federal regulations guide that

an agency may require an . . . employee who . . . occupies a position that has medical standards and/or physical requirements . . . to report for a medical examination:

> (1) Subsequent to a tentative offer of employment or reemployment (including return to work from medically based absence on the basis of a medical condition);
> (2) On a regularly recurring, periodic basis after appointment . . .; or
> (3) Whenever the agency has a reasonable belief, based on objective evidence, that there is a question about an employee's continued capacity to meet the medical standards or physical requirements of a position.

5 C.F.R. § 339.301(b) (emphasis added).  Likewise,

> [a]n agency may order a psychiatric examination (including a psychological assessment) only when:
> (i) The result of a current general medical examination that the agency has the authority to order under this section indicates no physical explanation for behavior or actions that may affect the safe and efficient performance of the applicant or employee, the safety of others, and/or the vulnerability of business operation and information systems to potential threats.

Id. at § 339.301(e)(1) (emphasis added).   In accordance with these regulations, individuals serving as police officers for the VA must pass a variety of annual physical and psychological assessments in order to maintain their positions, and can be subject to additional FFDEs after a prolonged medical absence or upon the agency's reasonable belief that an exam is necessary.   See e.g., VA Handbook 0720 at 94 ("A police officer's authority to carry a firearm is subject to management discretion and may be suspended for any lawful reason, including but not limited to change in the officer's assignment, reevaluation of need, pending allegations of officer misconduct, or modification of administrative policies."); Doc. 64 at 103 (VA Directive 0730) ("All police officer applicants and those currently employed must be capable of performing the designated physical and mental functional requirements essential to the duties of the police officer position."); VA Handbook 0730 at 116 ("Appropriate administrative action will be taken in the case of VA

police officers who are determined by annual medical examination to possess lasting physical or emotional conditions which, in the judgment of examining physicians, prevent the officers from performing the functional requirements of the position."); VA Handbook 0730 Appendix A at 20-21 (". . . annual medical examinations must include a psychological assessment of the . . . officer's emotional and mental stability by a psychiatrist or psychologist. Police officer duties include personal encounters with patients, visitors, and other employees. Encounters are often with mentally ill, irrational, or disturbed persons who, although assaultive or destructive, must be handled with understanding, full control of force, and unimpeded judgment. Any emotional or mental condition which could cause the . . . officer to be a hazard to others or self during stress situations and physical altercations will disqualify."). However, the applicable federal regulations and VA guidelines do not prescribe with absolute rigidity when the VA can require an employee to undergo a non-annual FFDE. Rather,

> [i]t depends upon a number of factors. It depends upon what happened. It depends on how the employee was followed for healthcare. It depends on whether there was a work-related injury. It depends on whether there was an impact on the duties, based on the injury. Every case is different so there are a number of factors that would impact on

when and whether VA supervisors might order a non-annual FFDE. See August 8, 2011 MSPB Hearing at 27 (testimony of Michele Manderino, VA Human Resources Officer).[19]

In accordance with the federal regulations and VA guidelines, Baldwin completed yearly FFDEs at the VA, which included both physical and psychological assessments.

---

[19] For example, the record reflects that the VA has required other officers to complete non-annual FFDEs, some of whom were removed from their officer positions. See e.g. August 8, 2011 MSPB Hearing at 155-56 (officer sent for FFDE where, after responding to calls he himself "would become a victim," and "was even admitted to the hospital on several occasions."); id. at 156 (after investigation associated with officer's handling of a firearm, and FFDE, officer removed from position for an extended period of time); id. at 157 (FFDE ordered for officer who "exhibited signs of instability").

Doc. 66-8 at 3 (Levin FFDE Report); Baldwin Deposition at 17-19. Notably, Baldwin himself testified that these FFDEs are important because they "ensure that the person can be able to qualify for their position." Baldwin Deposition at 18. If not, as Baldwin stated at his deposition, then the individual should not be in that position. Id.

After accidentally shooting himself in the finger, and upon receiving clearance from his personal physician to return to work, Baldwin's supervisor, Gordon, directed that Baldwin complete a FFDE, largely because of Baldwin's poor judgment in loading a weapon while he was driving which resulted in him accidentally shooting himself. See id. at 13; August 12, 2011 MSPB Hearing at 84-86. Gordon also thought Baldwin needed to undergo a FFDE because of his "bizarre" and sexually explicit statements about his daughter. See Gordon EEO Investigation Testimony at 6-7, 11, 19; MSPB Pre-hearing Submission at 6; August 12, 2011 MSPB Hearing at 54-55, 56-58, 109. It is undisputed that the conclusion of Baldwin's FFDE was that Baldwin was psychologically unfit, and thus unqualified to hold a position as a VA officer. April 27, 2009 Proposed Notice of Removal at 2; Gordon EEO Investigation Testimony at 10-11, 12, 14, 16; March 10, 2010 Proposed Removal Decision Letter at 2; MSPB Pre-hearing Submission at 9. Therefore, regardless of whether Baldwin had a fully functional pinky finger or not, or received accommodations for the same, based upon the FFDE he was not qualified to serve as a police officer. Hence, Baldwin fails to point to any genuine issue of fact for trial regarding his qualification for the position – the second element required for a prima facie case of disability discrimination. See J.A.M. v. Nova Southeastern Univ., Inc., 646 Fed. Appx. 921, 927 (11th Cir. 2016); Medearis v. CVS Pharmacy, Inc., 646 Fed. Appx. 891, 895 (11th Cir. 2016); Shepard v. United Parcel Service, Inc., 470 Fed. Appx. 726, 730 (11th

Cir. 2012); Dickey v. Dollar General Corp., 351 Fed. Appx. 389, 391 (11th Cir. 2009).

Thus, his disability discrimination claim fails.  See Boyle, 866 F.3d at 1288; Ellis, 432 F.3d

at 1326.

Baldwin also cannot establish that he was "subjected to unlawful discrimination

because of his disability."  Boyle, 866 F.3d at 1288.  In this context, Baldwin must show

that he suffered an adverse employment action "solely by reason" of his disability.  Ellis,

432 F.3d at 1326.  Here, the record establishes that the VA required Baldwin to complete

a FFDE and subsequently transferred him from his police officer position, not because

his finger was injured, but because of the poor choices Baldwin made that resulted in his

shooting incident and the results of the FFDE.  The record provides no support for an

inference that the VA imposed the FFDE on Baldwin, or transferred him from his position

because of his finger injury much less solely because of his finger injury.  Accordingly,

there are no genuine issues for trial as Baldwin has failed to present evidence supporting

the requisite elements of a prima facie case of disability discrimination.[20]  As such,

judgment in favor of the VA is due to be entered as to Count I.

---

[20] The Court also rejects Baldwin's suggestion that the VA discriminated against him by forcing him to complete the FFDE and transferring him from his police officer position, while it did not do the same for another VA police officer.  Baldwin Motion at 11; Doc. 65-1 at 67 (MSPB Pre-hearing Submission, Part. 2); Baldwin's Answers to Interrogatories at 26; August 12, 2011 MSPB Hearing at 131, 151; Baldwin Deposition at 60-64.  Here, Baldwin contends that another officer, John Kennedy, also had an accidental weapon discharge, but was not required to undergo a FFDE, and was not removed or transferred from his position.  Baldwin Deposition at 60-64.  In this setting,

> [i]n order to use comparators to support an inference of . . . discrimination in the context of
> workplace discipline, a plaintiff must show that the comparators' alleged misconduct is
> nearly identical to the plaintiff's in order to prevent courts from second-guessing employers'
> reasonable decisions and confusing apples with oranges.  Though the comparators need
> not be the plaintiff's doppelgangers, the nearly identical standard requires much more than
> a showing of surface-level resemblance.

Flowers v. Troup County, Ga., Sch. Dist., 803 F.3d 1327, 1340 (11th Cir. 2015) (citing Silvera v. Orange County. Sch. Bd., 244 F.3d 1253, 1259 (11th Cir. 2001)).  See also Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).  The record does not support a finding that Baldwin and Kennedy are nearly identical and "similarly situated in all relevant respects."  Holifield, 115 F.3d at 1562.  First, in contrast to Kennedy's accidental discharge where no one was injured, Baldwin's discharge resulted in a self-inflicted injury which

In Count III, which Baldwin titles "EEO Discrimination – Direct Threat," Baldwin alleges that the VA discriminated against him "based on his disability and/or perceived disability in violation of . . . [Baldwin's] rights protected under EEO laws, per 29 C.F.R. 1630.2(r), Direct Threat, by performing a FFDE on . . . [Baldwin] without just cause." SA Complaint at ¶ 55.[21] In making this claim, it appears that Baldwin is attempting to challenge the underlying reasons the VA required him to undergo the FFDE.

In addressing claims of disability discrimination, the Supreme Court has explained that an employer may rely on

> [a] qualification standard "shown to be job-related for the position in question and . . . consistent with business necessity." Such a standard may include "a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace," [42 U.S.C.] § 12113(b), if the individual cannot perform the job safely with reasonable accommodation, § 12113(a). By regulation, the EEOC carries the defense one step further, in allowing an employer to screen out a potential worker with a disability not only for risks that he would pose to others in the workplace but for risks on the job to his own health or safety as well: "The term 'qualification standard' may include a requirement that an individual shall not pose a <u>direct threat</u> to the health or safety of the individual or others in the workplace." 29 CFR § 1630.15(b)(2) (2001).

---

required that Baldwin take weeks off of work. <u>See</u> Baldwin's Answers to Interrogatories at 22; Doc. 69-10 at 3 (Avila Declaration). Second, Kennedy's accidental discharge occurred in the police service arms room at the NF/SGVHS and was immediately investigated. <u>See</u> Avila Declaration at 2-3. In contrast, Baldwin's accidental discharge occurred while he was off duty and driving while attempting to load a weapon, and required a more protracted investigation including investigation by another law enforcement agency. <u>See</u> Baldwin Deposition at 6-13, 30; Marion County Sheriff's Incident Report; August 8, 2011 MSPB Hearing Transcript at 35 – 38. In summary, Kennedy's accidental discharge occurred on VA property, the discharge did not injure Kennedy or anyone else, and the VA was able to immediately investigate the incident. Conversely, Baldwin accidentally discharged a weapon while off of VA property, other law enforcement entities had to investigate the circumstances of the discharge, and most importantly, as a result of the accidental discharge, Baldwin injured himself resulting in two different surgeries and an extended absence from work. Baldwin's absence from work, was which necessitated by his self-imposed injury from the accidental discharge, was the primary incident that prompted Gordon to require that Baldwin undergo a FFDE prior to returning to work. Given the differences between Kennedy and Baldwin's situations, Kennedy cannot serve as a valid comparator for the purpose of Baldwin's disability discrimination claim.

[21] In his deposition, Baldwin suggests that during an EEO staff conference in October of 2010 relating to one of his EEO complaints, a staff attorney told an EEO judge that the VA completed an FFDE for direct threat on Baldwin. Baldwin Deposition at 87.

<u>Chevron U.S.A. Inc. v. Echazabal</u>, 536 U.S. 73, 78-79 (2002) (emphasis added) (discussing and ultimately upholding the EEOC regulation).[22]

Consistent with this authority, the Eleventh Circuit has recognized that "[a]n employer may fire a disabled employee if the disability renders the employee a direct threat to his own health or safety. But there is no direct threat defense if the employer could have made reasonable accommodations." <u>Moses v. Am. Nonwovens, Inc.</u>, 97 F.3d 446, 447 (11th Cir. 1996) (internal citations and alternations omitted). When an employee asserts that he or she has been subject to an adverse employment action on the basis of his or her disability, the employer may raise as a defense to the employee's discrimination claim that the employee presented a direct threat that could not be otherwise addressed by a reasonable accommodation. <u>See</u> <u>e.g.</u>, <u>Coleman v. Penn. State Police</u>, 561 Fed. Appx. 138, 144 (3d Cir. 2014); <u>Pollard v. Drummond Co., Inc.</u>, No. 2:12-CV-03948-MHH, 2015 WL 5306084, at *6 (N.D. Ala. Sept. 10, 2015); <u>Lowber v. W.L. Halsey Grocery Co.</u>, No. CV-12-J-3429-NE, 2013 WL 3992504, at *4-5 (N.D. Ala. Aug. 5, 2013); <u>Crutcher v. Mobile Housing Board</u>, No. Civ.A 04-0499-WS-M, 2005 WL 2675207, at *14 (S.D. Ala. Oct. 20, 2005); <u>Adams v. Rochester Gen. Hosp.</u>, 977 F. Supp. 226, 233-34 (W.D. N.Y. 1997). A "direct threat" is defined as "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r). "A plaintiff can overcome the 'direct threat'

---

[22] Additionally, and as referenced earlier in the Order, regulations state that

> [a]n agency may order a psychiatric examination (including a psychological assessment) only when: (i) The result of a current general medical examination that the agency has the authority to order under this section indicates no physical explanation for behavior or actions that may affect the safe and efficient performance of the applicant or employee, the safety of others, and/or the vulnerability of business operation and information systems to potential threats.

5 C.F.R. § 339.301(e).

defense by showing that a reasonable accommodation would alleviate the risk.  42 U.S.C. § 12113(a)."  Richey v. City of Lilburn, 127 F. Supp. 2d 1250, 1263 (N.D. Ga. 1999) (citations omitted).  Notably, as the cited cases demonstrate, a "direct threat" analysis arises when an employer has taken an adverse employment action against a disabled employee and raises as a defense that no reasonable accommodation was available because the employee posed a direct threat.

It is not entirely clear from Baldwin's SA Complaint or his other filings before the Court whether he is asserting that the VA is unable to validly invoke the "direct threat" defense because it improperly subjected him to a FFDE in light of his alleged disability, see Moses, 97 F.3d at 447, or that the VA's general "qualification standard" was improperly applied to him.  See Echazabal, 536 U.S. at 78-79.  However, under either approach, Baldwin cannot prevail.  Preliminarily, the Court notes that the VA has not raised a direct threat defense in this action.[23]  More importantly, the record establishes as a matter of law that Baldwin was not an otherwise qualified individual who, despite his alleged disability (the injured finger), could perform the essential functions of his job with a reasonable accommodation.  As such, Baldwin's Count III (EEO Discrimination – Direct

---

[23] The Supreme Court has "described the 'direct threat' defense as an affirmative defense."  Pollard, 2015 5306084 at *6 (citing Chevron U.S.A., 536 U.S. at 78).  As such, "direct threat" does not exist, in and of itself, as an independent claim raised by a plaintiff, but rather serves as a defendant's defense to a plaintiff's allegation of disability discrimination.  See e.g., Hunt v. Aimco Prop., L.P., 814 F.3d 1213, 1225 (11th Cir. 2016) (noting role of direct threat affirmative defense in housing disability discrimination case); Lowe v. Ala. Power Co., 244 F.3d 1305, 1308 (11th Cir. 2001) (noting defendant's use of "direct threat" defense in ADA action); Moses, 97 F.3d at 447 (noting that "direct threat" is a defense available to employer) Ingalsbe v. Chertoff, No. Civ.A. 1:05-CV-1465, 2006 WL 908678, at *11 (N.D. Ga. Apr. 6, 2006) (defendant raised direct threat defense to undermine plaintiff's prima facie case of disability discrimination).  Hence, any argument in this case regarding a "direct threat" would most appropriately be raised as a defense by the VA to Baldwin's claim of disability discrimination in Count I.  The VA has not done so here.  Accordingly, Baldwin's assertion of a "EEO Discrimination – Direct Threat" claim in Count III is misplaced.

Threat) cannot proceed.  Therefore, summary judgment is due to be entered in favor of the VA on this Count.

Finally, in Count VII of his SA Complaint (failure to accommodate), Baldwin asserts that the VA failed to provide him with "reasonable accommodations upon [his] release to return to work by his attending physician."  SA Complaint at ¶ 71.[24]  "[A] qualified individual with a disability may be unlawfully discriminated against because of the individual's disability when the individual's employer does not reasonably accommodate the disability."  Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1285 (11th Cir. 1997) (citing 42 U.S.C. § 12112(b)(5)(A)).  However, an employer is not obliged to provide a reasonable accommodation to an employee who is not a qualified individual with a disability.  See Siudock v. Volusia County Sch. Bd., 568 Fed. Appx. 659, 663 (11th Cir. 2014) (citing Stewart, 117 F.3d at 1285-86)).  The Court has already determined that Baldwin is not otherwise qualified for the police officer position.  Thus, Baldwin's allegation that he was unlawfully denied a reasonable accommodation fails.  As such, summary judgment is due to be entered in favor of the VA on this claim.

In conclusion, the Court determines that summary judgment is to be entered in favor of the VA on Counts I, III, and VII.

**b.  Retaliation Claims (Counts II, IV, and VIII)**

In Counts II, IV, and VIII, Baldwin generally asserts that in response to his filing of EEO discrimination complaints, the VA retaliated against him by forcing him to undergo the FFDE, by removing him from his police officer position, and by determining him to be

---

[24] As the Court previously noted, Baldwin does not seek summary judgment on Count VII.  However, the VA has sought summary judgment on this Count.

ineligible for a newly posted VA police position, all in violation of the Rehabilitation Act. See generally SA Complaint at ¶ 51, 75.[25]

"The Rehabilitation Act incorporates the anti-retaliation provision from § 12203(a) of the ADA. 29 U.S.C. §§ 791(g), 793(g), 794(d). Retaliation claims under the ADA are analyzed under the framework of Title VII." Morales v. Ga. Dep't of Human Res., 446 Fed. Appx. 179, 183 (11th Cir. 2011). As such, "[c]ases decided under the Rehabilitation Act are precedent for cases under the ADA, and vice-versa." Cash, 231 F.3d at 1305 n.2.

In order to establish a prima facie case of retaliation under the Rehabilitation Act, a plaintiff must show the following: (1) the plaintiff engaged in statutorily protected activity under the Act; (2) the plaintiff suffered an adverse employment action; and (3) a causal connection exists between the protected conduct and the adverse employment action. Dale v. Wynne, 497 F. Supp. 2d 1337, 1344 (M.D. Ala. 2007) (citing Brochu v. City of Riviera Beach, 304 F.3d 1144, 1155 (11th Cir. 2002); Parris v. Miami Herald Publ'g Co., 216 F.3d 1298, 1301 (11th Cir. 2000)). If the plaintiff establishes a prima facie case of retaliation, then, under the McDonnell Douglas burden shifting framework, the defendant has the "opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action." Burgos-Stefanelli v. Sec'y, U.S. Dep't of Homeland Security, 410 Fed. Appx. 243, 246 (11th Cir. 2011); Edwards v. Gwinnett County Sch. Distr., 977 F. Supp. 2d 1322, 1334 (N.D. Ga. 2013). If the employer proffers such explanation, the plaintiff must then produce evidence that proves by a preponderance of the evidence that

---

[25] As noted previously in the Order, Baldwin's allegations in Count IV mirror his allegations in Count II, and thus will be treated as one and the same.

the proffered reason is pretext.  Burgos-Stefanelli, 410 Fed. Appx. at 246  (citing

Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001)).

Baldwin's claims in Counts II and IV fail because he is unable to show that a causal

connection exists between his alleged protected activity and the alleged adverse

employment actions the VA took against him.[26]  "A plaintiff establishes a causal relation

by proving that the protected activity and the negative employment action are not

completely unrelated."  Gooden v. Internal Revenue Serv., 679 Fed. Appx. 958, 967–68

(11th Cir. 2017) (quoting Meeks v. Computer Assocs. Int'l, 15 F.3d 1013, 1021 (11th Cir.

1994) (internal citations and alterations omitted)).  Moreover, courts

> construe the causal link element broadly so that a plaintiff merely has to
> prove that the protected activity and the adverse action are not completely
> unrelated. A plaintiff satisfies this element (for the purposes of making a
> prima facie case) if he provides evidence that (1) the defendant was aware
> of his protected expression or activity; and (2) there was a close temporal
> proximity between this awareness and the adverse action.

Williams v. Alabama Dep't of Indus. Relations, 684 Fed. Appx. 888, 894 (11th Cir. 2017)

(citing Higdon v. Jackson, 393 F.3d 1211, 1219 (11th Cir. 2004)).  Here, the uncontested

facts in the record, and in particular, the chronology of events, dispel any possible

inference that the requisite causal connection exists between Baldwin's alleged protected

activities and the VA's employment actions against him.

The record establishes that on January 28, 2009, the NF/SGVHS Human

Resources department formally informed Baldwin that he had to complete a FFDE in

order to fully resume his police officer duties.  January 28, 2009 FFDE Notification at 2-

3;  MSPB Pre-hearing Submission at 6-7.  Baldwin's supervisor, Gordon, had also

---

[26] The Court assumes without deciding that the VA's decisions to remove Baldwin from his police officer position and to transfer him to another department constitute adverse employment actions.

informed Baldwin earlier in the month that he would be required to complete a FFDE. See Baldwin EEO Complaints at 11; Baldwin's Answers to Interrogatories at 23. After Baldwin completed the FFDE which found him unfit to serve as a VA police officer, Baldwin received the April 27, 2009 letter from Gordon, informing Baldwin of his proposed removal as a police officer. April 27, 2009 Proposed Notice of Removal at 2. Then, on March 10, 2010, Sutton, Associate Medical Center Director of the NF/SGVHS, confirmed in a letter to Baldwin that Baldwin was being removed from his police officer position and being transferred to a different department within the VA, but at the same grade and salary level. March 10, 2010 Proposed Removal Decision Letter at 2; MSPB Pre-hearing Submission at 9; Sutton Declaration at ¶ 6. However, it was only in December of 2009, nearly eight months after the VA proposed that Baldwin be removed from his position as a police officer, that Baldwin began filing a series of EEO complaints against the VA regarding the FFDE and his job transfer. See generally Baldwin EEO Complaints. As this timeline demonstrates, the VA's alleged retaliatory adverse employment action against Baldwin – requiring that he undergo a FFDE and the decision to remove him from his police officer position – occurred before Baldwin engaged in his potentially statutorily protected activity of filing EEO complaints not after he did so. [27]

---

[27] As referenced earlier, in the Baldwin Response, Baldwin alleges for the first time that the VA retaliated against him for his involvement in a whistleblower investigation regarding another officer's alleged unauthorized use of a government car, wherein the investigation tangentially implicated Gordon. See MSPB Pre-hearing Submission at 9-10; Baldwin Deposition at 67-70; Baldwin EEO Complaints at 17. Baldwin did not raise this retaliation allegation in his SA Complaint. As such, the Court will not address the merits of this new claim raised for the first time in the summary judgment briefing. See Iraola & CIA, S.A. v. Kimberly-Clark Corp., 325 F.3d 1274, 1286 (11th Cir. 2003) (plaintiff cannot raise new claim at summary judgment stage); Flanigan's Enterprises of Georgia, Inc. v. Fulton County, Ga., 242 F.3d 976, 988 (11th Cir. 2001), superseded by statute on other grounds as noted in Buehrle v. City of Key West, 813 F.3d 973, 980 n.3 (11th Cir. 2015) (district court declined to address merits of new claim raised for first time in response to defendant's motion for summary judgment).

Moreover, even if Baldwin had asserted his whistleblower claim in a timely matter, the Court would be barred from considering it in the context of his Rehabilitation Act retaliation claims. Under the Rehabilitation Act, "a person engages in statutorily protected activity if [he] has opposed any . . . practice

The record establishes that the VA's decision to subject Baldwin to the FFDE, and the conclusion that the results of the FFDE warranted Baldwin's removal from the police officer position, occurred prior to his initiation of any EEO proceedings. Indeed, Baldwin initiated his EEO proceedings in response to learning that he was being removed from his police officer position. Accordingly, "it would defy logic to find that adverse actions which took place several months before any protected activity could somehow be causally related to each other." Bailey v. Town of Lady Lake, Fla., No. 5:05-cv-464-Oc-10GRJ, 2007 WL 1655374, at *5 (M.D. Fla. June 7, 2007) (emphasis in original). See also Gooden, 679 Fed. Appx. at 968 (no retaliation where alleged adverse employment action occurred before plaintiff engaged in protected activity); Howell v. Bluefield Reg'l Med. Ctr., Inc., No. 1:07-0112, 2008 WL 2543448, at *3 (S.D. W.V. June 23, 2008) (no causal connection where employer made termination decision prior to employee exercising statutorily protected rights); Cormack v. N. Broward Hosp. Dist., No. 08-61367-CIV, 2009 WL 2731274, at *5 (S.D. Fla. Aug. 26, 2009) ("Acts which precede protected activity cannot logically form the basis of causation of an adverse action."); Moore v. Hillsborough County Bd. of County Com'rs, 544 F. Supp. 2d 1291, 1306-07 (M.D. Fla. 2008) (no retaliation where employer made termination decision prior to employee filing EEO complaint); Smith v. Quintiles Transnational Corp., 509 F. Supp. 2d 1193, 1204 (M.D. Fla.

---

made unlawful by section 504 of the Rehabilitation Act." Edwards, 977 F. Supp. 2d at 1331 (internal citations omitted). As relevant here, the Rehabilitation Act prohibits "entities receiving federal funds from discriminating against otherwise qualified individuals with disabilities." Boyle, 866 F.3d at 1288. Accordingly, "filing a charge of discrimination is a statutorily protected activity." Simpson v. State of Alabama Dep't. of Human Res., 501 Fed. Appx. 951, 954 (11th Cir. 2012). Baldwin's whistleblowing activity regarding another employee's alleged unauthorized use of a government vehicle does not fall within the purview of the Rehabilitation Act. Therefore, this new claim of retaliation does not fall within the ambit of the Rehabilitation Act.

2007) (no causal connection where employer's decision to discipline employee occurred prior to employee's protected activity).

Given that the undisputed facts do not support even an inference that any alleged adverse employment action was causally related to his alleged protected activity, the Court determines that Baldwin is unable to establish a prima facie case of retaliation under the Rehabilitation Act. In reaching this decision, the Court recognizes that it was not until March of 2010 that the VA made the final decision to remove Baldwin from his police officer job and transfer him to a different department. Therefore the final decision to transfer Baldwin did come after he initiated his EEO proceedings. March 10, 2010 Proposed Removal Decision Letter at 2; MSPB Pre-hearing Submission at 9; Sutton Declaration at ¶ 6. However, the Eleventh Circuit has directed that in a retaliation case, "when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation." Drago v. Jenne, 453 F.3d 1301, 1308 (11th Cir. 2006). See also Saffold v. Special Counsel, Inc., 147 Fed. Appx. 949, 951 (11th Cir. 2005) ("When an employer makes a tentative decision before protected activity occurs, the fact that an employer proceeds with such a decision is not evidence of causation."). Here, the VA decided to remove Baldwin from his police officer position and communicated that decision to Baldwin prior to his EEO activities. Although that decision was only fully effectuated after Baldwin filed his EEO complaints, this timing does not support a retaliation claim. Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001) (the fact that the transfer occurred after the employer learned of protected activity "is immaterial in light of the fact that petitioner concededly was contemplating the

transfer before it learned of the suit. Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitely determined, is no evidence whatsoever of causality."). Therefore, summary judgment is to be entered in favor of the VA on Counts II and IV.

In Count VIII Baldwin alleges that he suffered retaliation because he was not selected for a newly posted police officer position. Summary judgment is also due to be granted to the VA on this claim. The VA contends that legitimate, non-discriminatory reasons exist for the decision not to select Baldwin for the new police officer position. VA Motion at 24. Baldwin presents no legal arguments as to this claim in his motion nor does he respond to the VA Motion with respect to this claim. As such, the Court could deem the claim abandoned.

More importantly, however, the record fails to present any evidence to support the "non-selection" claim asserted in Baldwin's SA Complaint. In his SA Complaint, Baldwin alleges that he

> was subject to reprisal once the [VA's] HR staff determined . . . [Baldwin] was ineligible as a Police Officer under Announcement Number: GF-13-STR-790925, dated 1-14-15, applied for position on 12-21-12. The [VA's] HR staff determined that [Baldwin] was ineligible due to the fact that [Baldwin] did not currently have Local, State, or Federal arrest authority at the time of the application process. . . . . [Baldwin] argues that he would have had [arrest] authority at the time of the application process, if it was not for the fact that the [VA] interfered with [Baldwin's] position as a Police officer due to the [VA's] unlawful Psychological FFDE results and the aftermath that ensued. Therefore, the [VA's] interfering actions and the aftermath was utilized to determine . . . [Baldwin's] ineligibility for the position under Announcement Number: GF-13-STR-790925, and was solely based upon the Plaintiff's filed and prior EEO activity.

SA Complaint at ¶ 75. While it is not entirely clear from his allegations, it appears that Baldwin is asserting that he applied for a police officer position in either 2012 or 2015, but was denied the position because he lacked arrest authority by virtue of the results of the 2009 FFDE, and in retaliation for his subsequent EEO activity.

The evidentiary record before the Court does reference a supervisory position for which Baldwin applied in 2008, but was not selected. See Gordon EEO Investigation Testimony at 4, 15, 18; Baldwin EEO Complaints at 5; Doc. 63-13 at 84 (Agency Complaint File to EEOC); January 12, 2012 VA EEOC Final Agency Decision at 3-4. However, Baldwin has not provided the Court with any evidentiary support for the allegations he lays out in Count VIII, specifically evidence that he was not selected for jobs for which he applied in either 2012 or 2015. As such, Baldwin has failed to direct the Court to any evidence supporting his allegations in Count VIII that the VA subjected him to an adverse employment action by not selecting him for the 2012 or 2015 job positions. At this, the summary judgment stage, Baldwin may not rest upon the mere allegations of his pleadings. See Rice-Lamar v. City of Ft. Lauderdale, 232 F.3d 836, 840 (11th Cir. 2000). Rather, Baldwin must "go beyond the pleadings, and by [his] own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Baldwin has failed to do so here. Moreover, it is undisputed that the VA determined Baldwin to be unqualified for the police officer position based on the FFDE. Baldwin has presented no evidence to support a conclusion that this determination was a pretext for unlawful discrimination. Therefore, summary judgment should also be granted in favor of

the VA on Baldwin's claim that the VA has not rehired him or returned him to a police officer position.

### c. Harassment/Hostile Work Environment Claims (Counts V and VI)

In Counts V and VI, Baldwin repeats the retaliation allegations he lays out in Counts II and IV, but supplements each with assertions that he was harassed and subjected to a hostile work environment. In Count V, Baldwin asserts that he "was subjected to an extreme Hostile Work Environment [wherein he] was under a Last Chance Agreement, in which [Baldwin] was under the fear of being fired." SA Complaint at ¶ 63. In Count VI, Baldwin reiterates some of the same assertions from Count V, and adds that he "was subjected to [an] extreme Hostile Work Environment on 3 occasions, in which [VA] staff advised [Baldwin] and/or EEOC [Administrative Law Judges] that [he] will never get his law enforcement position back, and that [Baldwin] is an undesirable." Id. at ¶ 67. From this, it appears Baldwin is contending that the VA harassed him and created a hostile work environment by subjecting him to the FFDE, by removing him from his police officer position, by imposing an LCA on him, along with subjecting him to three allegedly hostile statements by VA staff all in retaliation for complaining about discrimination.

In order to prevail on a hostile work environment claim, a plaintiff must establish the following elements:

> he belongs to a protected group; he has been subject to unwelcome harassment; the harassment was based on a protected ground; the harassment was severe or pervasive enough to alter the terms and conditions of his employment; and his employer is responsible for the harassment under a theory of vicarious or direct liability.

Litman v. Sec'y, of the Navy, 703 Fed. Appx. 766, 771 (11th Cir. 2017) (citing Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002)). To determine whether

the "harassing conduct was severe or pervasive enough to alter the terms or conditions" of the individual's employment, courts evaluate the conduct from both a subjective and objective perspective.  Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999). The Eleventh Circuit instructs:

> the employee must subjectively perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable.  The environment must be one that a reasonable person would find hostile or abusive and that the victim subjectively perceives to be abusive.  Furthermore, the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.

Id. (citing and quoting Oncale v. Sundowner Offshores Servs. Inc., 523 U.S. 75, 81 (1998); Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 23 (1993) (internal quotations and alterations omitted)).  The court has also identified four factors to consider in determining whether the harassing conduct "objectively altered an employee's terms or conditions of employment: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Id. at 1246 (citing Allen v. Tyson Foods, 121 F.3d 642, 647 (11th Cir. 1997) (additional citations omitted)).

Preliminarily, the Court notes that Baldwin attempts to include as part of his hostile environment claim, his allegations that the VA retaliated against him for filing his EEO complaints by forcing him to undergo the FFDE and then subsequently removed him from his police officer position.  SA Complaint at ¶¶ 63, 67.  However, the Court has already rejected those arguments in addressing Baldwin's retaliation claims.  See supra Section IV.b.  Thus, the Court limits its analysis of Baldwin's claims in Counts V and VI to his

allegations that he was subjected to a hostile work environment by virtue of the LCA, SA Complaint at ¶ 63, that on three different occasions VA staff made negative comments about Baldwin and his desire to regain his law enforcement position, id. at ¶ 67, and that Baldwin's supervisors were "constantly asking about [his] work performance . . . which made [him] feel like he [was] walking on eggshells while at work," Baldwin Motion at 22.

While Baldwin was in the process of advancing his EEO claims, he came to believe that the VA had placed him on an LCA without his knowledge. Baldwin Deposition at 87-88, 89, 90-91; LCA Documentation at 2-4. As such, on September 16, 2013, Baldwin sent an e-mail to then Secretary of the VA, Eric Shinseki, in which Baldwin catalogued a variety of complaints he had about his EEO process, the underlying FFDE, and his belief that he had been placed on an LCA. See LCA Documentation at 2-4. Baldwin included in his communication to Secretary Shinseki poorly copied and undated excerpts of interrogatories or depositions of VA staff regarding Baldwin's transfer from his police officer position to AMMS. See id. at 3-4. These excerpts suggested that certain VA staff believed that Baldwin had been placed on an LCA when he was transferred to AMMS. Id. However, in his own deposition, Baldwin acknowledged that he never received a copy of an LCA, never signed such an agreement, and could not confirm that the LCA actually existed. Baldwin Deposition at 90, 92. Notably, on September 19, 2013, three days after Baldwin sent his e-mail to Secretary Shinseki, Wisnieski, Director of the NF/SGVHS, responded to Baldwin. LCA Documentation at 7.[28] In that response, Wisnieski clarified that any statements by VA staff suggesting that Baldwin was on an LCA "was a misunderstanding;" that Baldwin was "not and [had] not been on a LCA;" "that [he] was

---

[28] In his deposition, Baldwin suggests that he did not receive Wisnieski's letter until a month after it was written. Baldwin Deposition at 93. This fact is not material to the Court's resolution of Counts V and VI.

never on a LCA;" and that staff were directed "to cease any reference of such in regard to" Baldwin.  LCA Documentation at 7.[29]  As such, the record establishes that the VA did not place Baldwin on an LCA.  Baldwin's belief that it did cannot support his hostile work environment claim.

Baldwin also bases his harassment and hostile work environment claims on negative statements made by VA staff about his desire to regain his police officer position, and on his allegations that his AMMS supervisors were constantly overseeing his work performance.  Specifically, Baldwin complains that in June of 2011, an individual present during a union mediation told Baldwin that "as far as the agency is concerned, you are never getting your law enforcement position back."  Baldwin's Answers to Interrogatories at 27.  Similarly, Baldwin contends that on September 25, 2013, an EEO staff attorney told Baldwin "[y]ou are never getting your position back."  Id.  Finally, Baldwin claims that on January 7, 2016, a different EEO staff attorney stated that "Mr. Baldwin can go elsewhere to get his law enforce[ment] position.  Mr. Baldwin is an undesirable and unsuited for the position with the VA."  Id.

Additionally, Baldwin claims his AMMS supervisors were "constantly asking about his work performance."  Baldwin Motion at 22; Baldwin Deposition at 90-91; Baldwin EEO Complaints at 3-4; Gordon EEO Investigation Testimony at 3.  In his deposition, Baldwin stated that he included in one of his EEO complaints that his supervisors were "constantly asking about my work performance."  Baldwin Deposition at 90.  He further suggested that his supervisor informed him that others at a higher administrative level kept asking

---

[29] In his deposition, Baldwin appears to maintain that despite never having seen or signed a copy of the purported LCA, and despite his communications with Shinseki and Wisnieski, the LCA was indeed "allocated" against him.  Baldwin Deposition at 92.

the supervisor about his performance.  Id. at 91.  However, Baldwin's factual allegations regarding this allegedly hostile work environment go no further.  In an abundance of caution, after reviewing the record, the Court identifies a few other instances in which Baldwin perceived he was being harassed in the workplace.  See Baldwin EEO Complaints at 3-4.  These include a complaint that on October 30, 2009, a supervisor joined Baldwin on an assignment, which Baldwin perceived as checking up on him.  Baldwin's EEO Complaints at 3.  On that same day, Baldwin noted several people told him that another supervisor was looking for him.  Id.  Likewise, on November 2, 2009, Baldwin again was advised that his supervisor was looking for him.  Id. at 4.  When Baldwin met with his supervisor, the supervisor informed Baldwin that the supervisor might start requiring Baldwin and other employees to complete a sign in/sign out sheet when they left the premises for work purposes.  Id.  However, the sign in/sign out sheet protocol was never instituted.  Feb. 12, 2015 EEOC Decision at 8.[30]

Even liberally construing Baldwin's pro se filings as including among his claims of a hostile work environment the additional allegations regarding his supervisors constantly checking on his work performance, on this record, the Court readily concludes as a matter of law that neither the alleged supervisor questions about Baldwin's work performance, oversight of Baldwin's work, or the purported derogatory statements by VA staff, were so frequent, severe, threatening or humiliating, to undermine the terms and conditions of Baldwin's employment at AMMS.  See generally Mendoza, 195 F.3d at 1246.

---

[30] The Court notes that these reported incidents of alleged harassment all occurred prior to Baldwin formally filing his EEO complaints.  See generally Baldwin EEO Complaints.  Nonetheless, the record does suggest that sometime in September of 2009, Baldwin "internally" informed the VA of his discrimination claims.  See e.g., Baldwin Deposition at 85-86, 95-100.

First, Baldwin makes only the most general assertions that while at AMMS, supervisors were constantly asking about his work performance. He presents no evidence suggesting that these inquiries were particularly frequent, motivated by retaliatory animus, or that they actually interfered with his work performance. Likewise, the alleged harassing comments directed at Baldwin regarding not getting his job back and being "an undesirable" were not frequent in nature. At most, Baldwin has identified three separate comments about his ability to return to a law enforcement position which occurred over a four and a half year period. See e.g., Guthrie v. Waffle House, Inc., 460 Fed. Appx. 803, 807 (11th Cir. 2012) (a dozen comments spread out over a period of eleven months are not sufficient to support a hostile work environment claim); Hopkins v. Baltimore Gas & Electric Co., 77 F.3d 745, 753 (4th Cir. 1996) (intermittent events over a seven year period not sufficient to establish a workplace harassment claim); cf. Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 808-814 (11th Cir. 2010) (claim for hostile work environment can proceed where offensive and derogatory comments occurred on a daily basis). Additionally, while one might view the VA employees' alleged comments about Baldwin as inappropriate, harsh, or perhaps even unkind, the comments were not so severe as to rise to the level of creating a hostile work environment. Cf. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) ("These standards for judging hostility are sufficiently demanding to ensure that [the law] does not become a general civility code."); Guthrie, 460 Fed. Appx. at 808 (boorish and rude comments do not rise to a level of severity required for a hostile work place claim); Reeves, 594 F.3d at 813 (workplace must present more than merely rough, indiscriminately vulgar or profane environment to support a harassment claim). Likewise, there was nothing threatening or

humiliating about the alleged comments.  See Guthrie, 460 Fed. Appx. at 808 (no harassment where plaintiff testified that she did not feel physically threatened by defendant's sexual and racially charged conduct); cf. Reeves, 594 F.3d at 813 (sexually charged and vulgar language with gender specific meanings and uttered with intent to belittle women was sufficient to show a hostile work environment).  Finally, there is no evidence in the record suggesting that the VA employees' alleged comments unreasonably interfered with Baldwin's job performance.  See e.g., Guthrie, 460 Fed. Appx. at 808 (evidence indicated that alleged harassment did not prevent plaintiff from performing job duties); Gowski v. Peake, 682 F.3d 1299, 1313-14 (11th Cir. 2012) (harassment including removal "from committees and projects, prohibited from conducting research, reassigned to different wards, and [being] given low proficiency ratings"); Ray v. Henderson, 217 F.3d 1234, 1245 (9th Cir. 2000) (harassment by supervisor made it more difficult for plaintiff to complete job tasks leading plaintiff to eventually take a stress leave from job).  Therefore, Baldwin fails to point to any evidence that creates an issue of fact as to whether a reasonable person in Baldwin's position would find the conduct at issue sufficiently severe or pervasively hostile to alter the terms and conditions of his employment to create a discriminatorily hostile work environment. See Mendoza, 195 F.3d at 1246.  As such, summary judgment will also be entered in favor of the VA on Counts V and VI.

Because the Court finds that summary judgment is due to be entered for the VA on all of Baldwin's claims, the Court necessarily concludes that the Baldwin Motion seeking entry of summary judgment in his favor, as to some of his claims, is due to be denied.

Accordingly, it is **ORDERED**:

1. The Clerk of the Court is directed to substitute Robert Wilkie, United States Secretary of Veterans Affairs, as Defendant.

2. Plaintiff's Request for Relief to Reply to Defendant's 3-23-18 Submission, in Support of Plaintiff's Summary Judgment Motion (Doc. 79) is **DENIED**.

3. Plaintiff's Request to Add an Additional Claim of Reprisal of Prior EEO Activity (Doc. 87) is **DENIED**.

4. The Federal Defendant's Motion for Summary Judgment (Doc. 69) is **GRANTED**.

5. Plaintiff [sic] Request Motion for Summary Judgment (Doc. 63) is **DENIED**.

6. The Clerk of the Court is directed to enter **JUDGMENT** in favor of Defendant, Robert Wilkie, Secretary of Veterans Affairs, United States Department of Veterans Affairs, and against Plaintiff, Raymond B. Baldwin.

7. The final pre-trial conference scheduled for March 5, 2019, is cancelled and the case is stricken from the Court's trial term.

8. The Clerk of the Court is further directed to terminate any remaining pending motions and deadlines as moot and close the file.

**DONE AND ORDERED** in Chambers, this 7th day of February, 2019.

MARCIA MORALES HOWARD
United States District Judge

lc26

Copies to:

Counsel of Record

Pro Se Party